**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                      NO. 14-119-SDD-SCR

VANESSA HERNANDEZ

**RULING**

     This matter is before the Court on Defendant Vanessa Hernandez's *Motion to Suppress.*[1] The Government filed an *Opposition*[2] to this motion. A hearing on this motion was held on December 17 and 18, 2014. The parties were ordered to file post-hearing briefs, which the Court has reviewed and considered along with all of the evidence and testimony presented at the hearing. For the reasons which follow, the motion will be denied.

## I.     FACTUAL BACKGROUND

     Tornado Bus Company is a commercial transportation carrier that primarily transports Hispanic passengers traveling throughout the United States and Mexico. On September 29, 2014, at approximately 12:15 a.m., a commercial passenger bus owned by Tornado Bus Company was traveling eastbound on I-12 in Baton Rouge. Officer Luke Cowart of the DEA Baton Rouge High Intensity Drug Trafficking Area (HIDTA) Interdiction Task Force, testified that he observed the bus swerve[3] out of its traffic lane crossing the

---

[1] Rec. Doc. Nos. 16 & 19.

[2] Rec. Doc. No. 22.

[3] Rec. Doc. No. 31, p. 10.

white lines on two occasions in violation of state and city traffic laws.[4] Officer Cowart testified that he pulled the bus over and conducted a traffic stop based on the alleged improper lane usage.[5] Officer Brad Bickham, Officer Cowart's partner, was sitting on the side of the interstate when he observed Officer Cowart stopping the passenger bus, and he pulled up behind Officer Cowart to assist.[6]

The bus driver, Esteban Romero ("Romero"), presented a valid Texas commercial driver's license and Officer Cowart testified that he issued a verbal warning for the alleged traffic violation.[7] Romero testified that he did not commit a traffic violation on the night in question, that the officers did not give him any verbal warning, and that he "was told that they wanted to check the bus."[8] Before releasing the bus, Officer Bickham asked Romero where the bus was headed, to which he responded the bus was coming from Houston, Texas, traveling to Atlanta, Georgia.[9] Officer Cowart then requested consent of the bus driver to allow a narcotic detecting K-9 to conduct a sniff/search of the luggage contained in the compartment under the bus.[10] Officer Cowart testified that Romero "granted that consent, he said, yes."[11]

---

[4] *Id.* at p. 9.

[5] *Id.* at p. 11.

[6] *Id.* at p. 40.

[7] *Id.* at p. 11 & 40.

[8] *Id.* at p. 74.

[9] *Id.* at p. 11.

[10] *Id.* at p. 12.

[11] *Id.*

Doc 25293                                    2

Officer Cowart's K-9 sniffed through the communal luggage area under the bus. After the K-9 excitedly alerted to a particular piece of luggage, Officer Cowart testified that he and Officer Bickham performed a cursory check of this luggage: "We really didn't get through it that much. We unzipped it, opened it, looked and most of the time on these seizures it's pretty much readily seen, the narcotics in there. In this case it wasn't. We didn't see anything but the clothes and the bottles, so that's when we put it back in there."[12] However, the K-9 again alerted to this particular bag, and Officer Cowart testified that it was after this second alert that he and Officer Bickham performed a more thorough search of the bag.[13] Officer Cowart also testified that this entire sniff and search took approximately three minutes.[14] The search of the bag revealed thirty-six plastic bottles believed to contain liquid methamphetamine.[15]

Officer Cowart also testified that he removed the Tornado claims tag attached to the luggage, which read "Vanessa Miranda," and gave it to Officer Bickham to find the passenger.[16] The Defendant was identified on the bus with the matching baggage claim ticket and escorted off the bus by Officer Bickham.[17] Officer Cowart testified that, as soon as the Defendant got off the bus, "right there by the driver's door," he witnessed Officer

---

[12] *Id.* at p. 32.

[13] *Id.*

[14] *Id.* at p. 33.

[15] *Id.* at p. 15. The substance was tested and later determined to be methamphetamine.

[16] *Id.* at 16.

[17] *Id.*

Bickham advise her of her legal rights pursuant to *Miranda*.[18] Both Officers Cowart and Bickham testified that the Defendant was asked if she understood her rights and that she responded "yes" in English.[19] Both officers also testified that the Defendant responded, "yes, that's mine" when asked if the bag belonged to her.[20] The Defendant was then handcuffed and placed in the back of a police unit.[21] According to Officer Bickham, the Defendant indicated that she wanted to cooperate with law enforcement and proceeded to describe, in English, her role and participation in trafficking methamphetamine.[22]

The Defendant was taken to the DEA Baton Rouge Resident Office and placed in a room with Border Patrol Agent Jennie Lipani, Special Agent Sabrina Gonzales, and two HIDTA taks force agents. Agent Lipani, who is fluent in Spanish, advised the Defendant of her *Miranda* rights in Spanish. The Defendant indicated that she understood all of her rights, and Agent Lipani testified that the Defendant said she did not want to say anything and requested a lawyer.[23] Agent Lipani testified that, at this point, she advised the others in the room that the Defendant did not wish to speak and wanted a lawyer, and the other agents left the room.[24] Agent Lipani testified that she remained in the room for security

---

[18] *Id.*

[19] *Id.* at p. 16 & p. 40-41.

[20] *Id.* at 16 & 41.

[21] *Id.*

[22] *Id.* at p. 41.

[23] *Id.* at p. 63.

[24] *Id.* at p. 65.

purposes.[25]  Agent Lipani further testified that, as soon as the other agents left the room, the Defendant "began to break down and asked, begged me not to send her to jail, to please let her go.  She also said that she had just done it because she needed money for her kids."[26]  Agent Lipani testified that in no way did she question, elicit, or prompt the Defendant to make any statement.[27]

The Defendant was charged by *Indictment* with possession with the intent to distribute methamphetamine in violation of 21 U.S.C. § 841(a)(1).  The Defendant has moved to suppress the evidence obtained in the search and any related alleged statements.

## II.    LAW & ANALYSIS

### A.    Motion to Suppress

Generally, "[t]he proponent of a motion to suppress has the burden of proving, by a preponderance of the evidence, that the evidence obtained was in violation of the Fourth Amendment.[28]  The burden of proof shifts to the Government, however, when the search at issue was conducted without a warrant.[29]  Therefore, with respect to the motions to suppress evidence and statements made in this case, the Government bears the burden

---

[25] *Id.*

[26] *Id.* at p. 66.

[27] *Id.*

[28] *United States v. Kelley*, 981 F.2d 1464, 1467 (5th Cir.1993) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir.1992))(emphasis added).

[29] *See  United States v. Guerrero–Barajas*, 240 F.3d 428, 432 (5th Cir.2001), *cert. denied*, 534 U.S. 1113, 122 S.Ct. 919, 151 L.Ed.2d 884 (2002).

of proving, by a preponderance of the evidence, that the seizure and search were constitutional and that the statements were voluntarily and knowingly made. The judge's role at a suppression hearing is to determine the credibility of witnesses and find the facts.[30] At a suppression hearing, it is "well within the trial court's discretion" to weigh the evidence and make credibility determinations regarding conflicting testimony.[31]

### B. *Terry* Traffic Stops

The legality of traffic stops are analyzed for Fourth Amendment purposes under the standard articulated in *Terry v. Ohio*.[32] "This standard is a two-tiered reasonable suspicion inquiry: (1) whether the officer's action was justified at its inception, and (2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place.[33] In addition, 'the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'"[34] "However, once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable, reasonable suspicion.[35] 'At that point, continuation of the detention is no longer supported by the facts

---

[30] *See United States v. Jones*, No. L12-10, 2012 WL 1309837, at *7 (S.D. Tex. Apr. 16, 2012).

[31] *Norman v. Stephens*, No.H-13-0624, 2013 WL 6498979, at *21 (S.D. Tex. Dec. 11, 2013).

[32] 392 U.S. 1 (1968).

[33] *United States v. Valadez*, 267 F.3d 395, 398 (5th Cir.2001) (citing *Terry*, 392 U.S. at 19–20).

[34] *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983).

[35] *Id.*

6

that justified its initiation.'"[36]

Considering the first prong of the *Terry* analysis, the Fifth Circuit has held that "for a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."[37]  The Supreme Court has instructed that, in making a reasonable suspicion inquiry, a court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing."[38]  The Fifth Circuit has held that "reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure."[39]

In evaluating the totality of the circumstances, a court may not consider the relevant factors in isolation from each other.[40]  In scrutinizing the officer's basis for suspecting wrongdoing, it is clear that the officer's mere hunch will not suffice.[41]  It is also clear, however, that reasonable suspicion need not rise to the level of probable cause.[42]

In a recent opinion, the Fifth Circuit discussed the issue of whether a traffic stop is

---

[36] *Id.* (quoting *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir.1993)).

[37] *U.S. v. Lopez–Moreno*, 420 F.3d 420, 430 (5th Cir.2005).

[38] *United States v. Arvizu*, 534 U.S. 266, 273 (2002).

[39] *Lopez–Moreno*, at 430.

[40] *Arvizu*, 534 U.S. at 274.

[41] *Terry*, 392 U.S. at 27.

[42] *Arvizu*, 534 U.S. at 274 (emphasis added).

justified at its inception.[43]  The Fifth Circuit noted that "if the alleged traffic violation forming the basis of the stop was not a violation of state law, there is no objective basis for justifying the stop."[44]  The Fifth Circuit articulated that:

> The government bears the burden of proving that the stop was constitutional when, as here, the stop and search were conducted without a warrant. Thus, the suppression hearing provided the government the opportunity and obligation to present evidence establishing the validity of the traffic stop.[45]

Defendant contends that the traffic stop in this case was not justified at its inception for several reasons.  First, Defendant points to Officer Cowart's testimony describing the alleged "swerving" that changed to "crossing" over the line, and even just a "gradual drift" over the line by one foot.  Defendant also notes the fact that Officer Cowart's dash camera was inoperable and failed to record any footage of this stop.

Additionally, Defendant points to the contradictory testimony of Officers Cowart and the bus driver Esteban Romero, particularly emphasizing Romero's testimony that he had not committed a traffic violation, was not given a verbal warning by the officers, and was told that he was being pulled over because they wanted to check the bus.[46]  The Defendant avers that, because Romero is "the only disinterested witness in this investigation,"[47] his testimony should be given more weight or credibility than Officers Cowart and Bickham.

---

[43] *U.S. v. Raney*, 633 F.3d 385 (5th Cir. 2011).

[44] *Id.*, at 340.

[45] *Raney*, 633 F.3d at 392.

[46] Rec. Doc. No. 31, p. 74.

[47] Rec. Doc. No. 33, p. 5.

The Defendant essentially contends that, based on the conflicting evidence presented, the Government has failed to carry its burden that Officer Cowart had a reasonable suspicion that a traffic violation occurred. Thus, Defendant argues this was an illegal stop made solely for the purpose of searching for drugs, and all evidence obtained from this search should be suppressed.

The Government argues that Officer Cowart's stop of the bus was objectively reasonable under the circumstances. Officer Cowart's testified that he observed the bus cross the white line on two occasions, which is a violation of traffic laws. Also, Officer Cowart testified that his experience led him to believe there might be a security threat on the bus or that the bus driver could have been incapacitated or falling asleep. The Government contends Officer Cowart's testimony was credible and trustworthy to support his reasonable and articulable suspicion that the bus driver committed traffic violations and that there might exist a potential security threat or incapacitated driver on the bus.

The Court finds that the evidence presented supports a reasonable suspicion that a traffic violation had occurred sufficient to justify the traffic stop in this case. While the Court has concerns that the alleged traffic violation was not the true motive for Officer Cowart's decision to stop the bus, the Court is also mindful that: "An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses."[48] Thus, "an officer's subjective motivations are irrelevant in

---

[48] *United States v. Lenz*, 162 Fed. Appx. 379, 382 (5th Cir. 2006).

determining whether his or her conduct violated the Fourth Amendment."[49] Subjectively,

Officer Cowart testified that, in his experience working with the DEA Task Force, he is

aware that Houston and Atlanta are "known narcotic distribution hubs."[50] Cowart further

testified: "I know this from past investigations and prosecutions. I also know that narcotic

smugglers are starting more frequently to use these commercial passenger vehicles to

smuggle their illegal narcotics because they have been getting away with it."[51] However,

the Court must look to the objective facts also known to Officer Cowart at the time of the

stop. While the Defendant attempts to discredit Officer Cowart's testimony by alleging his

language changed in describing what movements he observed by the bus, the Court finds

that in any context, whether the bus swerved, veered, crossed, or drifted over the white

lines, such movement constituted improper lane usage.[52] Further, considering the time of

night (12:15 a.m.), it was objectively reasonable, in light of his experience, for Officer

Cowart to have concern that the bus driver might be incapacitated or sleepy, or that a

security threat existed on the bus.

---

[49] *United States v. Williams*, 2007 WL 184996 at *3 (W.D. La. Jan. 22, 2007)(citing *Scott v. United States*, 436 U.S. 128, 138, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978); *Devenpeck v. Alford*, 543 U.S. 146, 153, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). *See also Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir.1997) ("So long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment....").

[50] Rec. Doc. No. 31, p. 11.

[51] *Id.*

[52] The Government contends this action violated La. R.S. 32:79(1), Baton Rouge, Louisiana, Code of Ordinances, Traffic Code Sections 11:53(b)(Traffic Lanes), and 11:103 (Turning Movements and Required Signals).

In *United States v. Grant*,[53] the defendant challenged a traffic stop on similar grounds. The defendant argued that the officer did not have reasonable suspicion to justify the traffic stop based on his crossing or swerving across the center line of traffic. The defendant alleged that the stop was pretextual because the officer had followed the defendant for some distance. The defendant also asserted that failing to maintain a single lane of traffic was not valid grounds for initiating a stop under Texas law.[54] The court rejected both arguments. First, the court recognized that there was conflicting testimony between the officer and the driver but held: "the fact that [the officer] may have initially been motivated to 'observe the driver's driving habits' for the purpose of drug interdiction rather than enforcing traffic laws is of no consequence. Officers are justified in making pre-textual stops so long as there was probable cause to believe that a traffic violation had occurred."[55] Next, the court referred to the Fifth Circuit's decision in *United States v. Zucco*[56] which upheld the very same traffic violation as sufficient grounds for making a traffic stop. The *Grant* court stated:

> The [Fifth Circuit] held that the traffic stop was valid because the defendant repeatedly veered onto the shoulder of the road, which "arguably was a violation" of a state statute requiring drivers to keep their vehicle within a single lane of traffic. *Id.* Although Defendant may not have been convicted for violating this traffic law, he was "arguably" in violation of the statute, creating probable cause to make the stop. *United States v. Santiago*, 310

---

[53] 2007 WL 677636, at *4 (S.D. Tex., Feb. 28, 2007).

[54] *Id.*

[55] *Id.*, citing *United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir.1987) (noting "so long as police do no more than they are objectively authorized and legally permitted to do, their motives in doing so are irrelevant and hence not subject to inquiry").

[56] *Id.*, citing *Zucco*, 71 F.3d 188, 190 (5th Cir. 1995).

F.3d 336, 341 (5th Cir. 2002). Therefore, the Court finds that Meakins was justified in initiating the traffic stop based on the Defendant's failure to maintain a single lane of traffic.[57]

Similarly, in the present case, the Court could draw the conclusion that Officer Cowart's motive for stopping the bus was pre-textual; however, there also existed objectively reasonable grounds to suspect that a traffic violation had occurred. The Court also notes that, while it does not find Romero's testimony to lack credibility, Romero did express sufficient confusion to suggest that his memory of this particular night and traffic stop might not be particularly sharp. For example, counsel for the Defendant acknowledges that Romero mistakenly testified that his route on the date in question was from Houston to Florida, and that he would not have been allowed to stop in Atlanta, Georgia on this route.[58] Moreover, Romero testified that he generally does not pay close attention to "those things," which the Court can only assume from context means traffic stops. Romero was asked what stuck out in his memory about the date in question, and he responded: "I just – those things I don't pay attention to those things. I – now because I am here and because I have been asked about that is that I know, but I didn't even remember the date. I didn't think about that."[59] While the Court finds that Romero had no intention to be deceptive, these statements do cause the Court to question his memory of the stop. On the contrary, the Court found no reason to discredit or disbelieve the testimony of Officer Cowart. Furthermore, while Romero testified that he did not cross the

---

[57] *Id.* at *5.

[58] Rec. Doc. No. 31, pp. 73-74.

[59] *Id.* at pp. 80-81.

lines and was not given a verbal warning by Officer Cowart, Officer Bickham corroborated Officer Cowart's testimony that he had given a warning regarding lane usage to Romero. Officer Bickham testified: "once I observed him stopping the bus, I pulled up behind him to assist. And when I got out I approached the bus, the door to get on the bus with Officer Cowart. And he made contact with the driver and advised him why he was being stopped and gave him a verbal warning."[60] The Court simply has no reason to give greater weight to Romero's testimony than to that of the officers. Accordingly, the Court finds that the traffic stop was justified at its inception.

### C. Continued Detention Beyond the Traffic Stop and Consent

The Defendant contends that, even if the initial stop was justified, the officers lacked reasonable suspicion to continue the detention and search the bus. Because the detention exceeded the allegedly valid reason for the stop, Defendant argues Officer Cowart's request to have his K-9 search the bus was not reasonably related in scope to the circumstances that caused him to stop the vehicle and delayed the bus occupants longer than necessary to investigate the alleged traffic violation. Absent some additional articulable suspicion that further criminal activity was underfoot, Defendant maintains that the continued seizure of the bus and passengers beyond the traffic stop was unreasonable. The Government contends that no additional articulable suspicion was required to extend the traffic stop and seizure because Romero consented to the search of the bus.

"Consensual searches ... serve as an exception to the warrant requirement so long

---

[60] *Id.* at p. 40.

as the consent is free and voluntary."[61]  "The government's ability to rely upon the consent exception depends on two factors.  First, the government must show that the consent was given voluntarily ... Second, the prosecution must show that either the defendant himself consented to the search or that consent was obtained from a third party that had the ability to furnish valid consent."[62]  Consent-to-search voluntariness is determined by a six-factor, totality-of-the-circumstances analysis.  The factors are:   (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.[63]  "No one of the six factors is dispositive or controlling of the voluntariness issue."[64]  The government has the burden of proving by a preponderance of the evidence that consent was freely and voluntarily given.[65]

### 1.    Voluntariness of Consent

With respect to the first factor, the Defendant contends that, by preceding the

---

[61] *U.S. v. Fernandes*, 285 Fed. Appx. 119, 126 (5th Cir. 2008) (citing *U.S. v. Mata*, 517 F.3d 279, 290 (5th Cir. 2008))**.**

[62]  *U.S. v. Jenkins*, 46 F.3d 447, 451 (5th Cir.1995) (citing *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *U.S. v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)); *see Morales v. Boyd*, 304 Fed. Appx. 315, 318–19 (5th Cir. 2008) (citing *Jenkins* ).

[63] *Fernandes*, 285 Fed. Appx. at 126 (citing *Mata*, 517 F.3d at 290).

[64] *U.S. v. Ponce*, 8 F.3d 989, 997 (5th Cir.1983).

[65] *Id.*

request to search the bus with the words, "prior to letting you go," it was reasonable for Romero to assume he was not free to leave. The Defendant further contends that a reasonable person would not believe he was free to leave based on the fact that the officer never specifically informed Romero that he was free to leave after issuing the verbal warning. The Government counters that, although Romero was seized for purposes of the traffic stop, he was free to leave once the verbal warning was issued, and he voluntarily extended the seizure by giving the officers permission to search the bus. In fact, the Government contends the officers believed Romero to be cooperative and helpful in their investigation. The Court finds that the first factor weighs in favor of consent. Romero was seized for the purposes of the traffic stop, but he was clearly not in police custody. Moreover, Officer Cowart's "prior to letting you go" was also followed by the words "do you mind... ."[66] Such language suggests Romero's freedom to decline the request and the officer's acknowledgment that Romero had that choice. Also, when asked whether Tornado Bus Company has a policy requiring its drivers to consent to stops with police officers, Romero responded: "No, they leave it to our discretion."[67] This answer likewise suggests Romero understood that he had the "discretion" to consent or refuse the officers' request.

Defendant also contends that the use of the words "prior to letting you go"

---

[66] Rec. Doc. No. 31, p. 12.

[67] *Id.* at p. 76.

constitutes a coercive police procedure to obtain consent.[68]  The Government counters that there is no evidence of any coercive police procedures in obtaining Romero's consent. Romero was never asked to disembark the driver's seat of the bus, and Officer Cowart testified that Romero continued writing in his logbook throughout the stop.[69]  The Government also notes that both officers were in uniform but never removed their weapons from their holsters or directed any physical or verbal threats towards Romero.  The Court agrees that there is no evidence of coercive police procedures for the reasons given by the Government.  Again, Officer Cowart's "do you mind" likewise undermines any suggestion of coercive or threatening tactics.

The Defendant concedes that the third factor weighs in favor of consent as the evidence presented establishes Romero fully cooperated with the police throughout the investigation.  Romero assisted Officer Bickham in opening the doors to the luggage area and aided in identifying the Defendant.

Defendant contends that the fourth factor weighs heavily against consent as Romero's testimony establishes that he did not believe he could refuse the officers' request.[70]  Romero testified as follows:

> You cannot refuse the offcers' orders.  You cannot do anything about it.  You can only just stay there and watch them do it from certain distance.  That's

---

[68] Defendant urges the Court to adopt the reasoning by the United States District Court for Colorado in *United States v. Gastellum*, 927 F. Supp. 1386 (D. Colo. 1996), where the court held that the officer's preface to the question of consent with "before you go," gave rise to an inference that the defendant was not, in fact, free to leave and was coercive.  The Court declines the request for the reasons given.

[69] Rec. Doc. No. 31, p. 11.

[70] The Defendant has not argued that Romero had a problem understanding the officers, who spoke in English, because Spanish is his first, and preferred language.

all you can do. You cannot tell them – you cannot – you cannot check because that will bring you problems.[71]

The Government acknowledges this testimony but argues that, based on Romero's prior criminal record,[72] his experience with the criminal justice system after a previous arrest and conviction suggests at least a "rudimentary comprehension of the criminal justice system and police encounters."[73]

The Court finds the fourth factor to be a close call. The Court does not find that Romero's prior criminal record is probative nor suggestive of his comprehension of the system. Romero's testimony is somewhat conflicting as the above statement indicates that he did not believe he was free to decline the officers' request. However, as the Court pointed out previously, Romero also referenced the bus drivers' "discretion" to consent to the officers when asked about an official company policy. In any event, the Court must consider the applicable law on this issue. To the extent the Defendant contends that the Constitution requires that a lawfully seized individual be told he is free to leave before his consent to the police's request to search or to question is recognized as voluntary, this Court is bound by the Supreme Court's consistent refusal to require such an affirmative statement by the officers.[74] Moreover, proof that a suspect had knowledge of a right to

---

[71] *Id.* at p. 76.

[72] There was limited testimony related to Romero's previous conviction for drug trafficking in 2007.

[73] Rec. Doc. No. 32, p. 8.

[74] *United States v. Zertuche-Tobias*, 953 F. Supp. 803, 819 (S.D. Tex. 1996)(citing *Robinette*, 519 U.S. 33, 117 S.Ct. 417, 136 L.Ed.2d 347; *Chesternut*, 486 U.S. at 574, 108 S.Ct. at 1979–80).

refuse is not required for effective consent to a search.[75] Thus, the Court is inclined to find that this factor also weighs in favor of consent. Even if the Court weighed this factor against consent, it would be the only factor against consent and insufficient to tip the scales against such a finding.

The fifth factor requires the Court to assess the education and intelligence of the individual. The Defendant contends there is no evidence as to this factor; thus, it does not weigh in favor of either party. The Government contends Romero gave no suggestion to the officers that he lacked any understanding of their questions or investigation. The Government also points to Romero's prior experience with law enforcement as sufficient intelligence regarding his rights in this situation. Furthermore, although Romero's first language is Spanish, and he testified at trial in Spanish with the aid of an interpreter, the Government contends it was clear that Romero understood many of the questions asked at the hearing before they were translated because he answered before the questions were fully translated. Thus, no language barrier prevented Romero from understanding the nature of the traffic stop and the requests by the officers. The Court agrees that nothing in the record suggests that Romero is of less than average intelligence such that he could not fully understand the nature of the situation. The Court finds that the fifth factor weighs in favor of consent.

The sixth and final factor involves whether Romero believed incriminating evidence would be found by the investigation. The Court finds that this factor weighs in favor of

---

[75] *Id.*, citing *Schneckloth*, 412 U.S. at 231, 248–49, 93 S.Ct. at 2049–50, 2058–59; *Gonzales,* 79 F.3d at 421 (while the government did not inform defendants that they need not consent, "there is no absolute requirement that the government establish that [defendants] knew they could refuse; it is merely one of the factors").

consent because Romero clearly did not know the Defendant and assisted the officers in searching the luggage compartment of the bus. Both of these facts suggest that Romero did not believe contraband would be found on the bus.

The Court has weighed the six factors set forth above and finds that Romero voluntarily consented to the sniff/search of the luggage compartment of the bus. The Court turns to the question of whether, under the circumstances presented, the bus driver's consent can be imputed to the Defendant, a passenger on the bus.

## 2. Third-Party Consent - Seizure

The issue of whether consent to be seized/searched by the driver of a bus may be imputed to the passengers in the bus was examined at length by the Fifth Circuit in *United States v. Hernandez-Zuniga*.[76] In *Hernandez–Zuniga*, the defendant was a passenger on a bus stopped by United States Border Patrol agents.[77] The bus company, Valley Transit Company ("VTC"), had consented to random stops for citizenship inspection.[78] Ultimately, the defendant was found to have cocaine in his bag.[79] The defendant moved to suppress the evidence on grounds that the stop of the bus was an unlawful seizure in violation of the Fourth Amendment, and the motion was denied.[80] The district court found that VTC and the bus driver consented to the stop by Border Patrol, and, because this stop was

---

[76] 215 F.3d 483 (5th Cir. 2000).

[77] *Id.* at 484.

[78] *Id.* at 485.

[79] *Id.*

[80] *Id.*

consensual, it was constitutional and did not violate the defendant's Fourth Amendment rights.[81]  Both parties appealed.

Assuming that the defendant was seized by the Border Patrol Agents, the Fifth Circuit stated that the question became whether this seizure was reasonable.[82]  The court discussed "reasonableness" as defined by the Supreme Court:

> "The reasonableness of seizures that are less intrusive than a traditional arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."[83] This test requires us to consider "the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."[84]  In the case before us, we have the additional consideration of the effect of VTC's consent.[85]

Next, the court recognized that, "[a]lthough the concept of third party consent has been most often applied in the context of searches, it can also be applied to seizures.[86]  On this point, the court stated:

> Arguably, a seizure by consent is presumptively reasonable because "the consent acknowledges the individual's right to be free from interference and vitiates the intrusiveness of the action."[87]  Here, however, the seizure is authorized by a third party, rather than each of the individuals subject to the

---

[81] *Id.*

[82] *Id.* at 487.

[83] *Id.*, quoting *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (citations and internal quotation marks omitted).

[84] *Id.*, quoting *Brown*, 443 U.S. at 51.

[85] *Id.*

[86] *Id.*, citing *United States v. Woodrum*, 202 F.3d 1, 11 (1st Cir. 2000).

[87] *Id.*, quoting *Woodrum*, 202 F.3d at 11 (citing *Florida v. Jimeno*, 500 U.S. 248, 250–51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991)).

seizure. Therefore, we analyze the reasonableness of a seizure conducted pursuant to third party consent, and determine whether that consent justifies the stop.

Hernandez maintains that, despite VTC's consent, absent a warrant or reasonable suspicion of criminal activity, the Border Patrol's seizure was unconstitutional because the bus was stopped by agents, rather than stopped for another purpose. Like the district court, we do not accept this argument. By purchasing a bus ticket from VTC and boarding its bus, Hernandez relinquished to VTC a substantial amount of control over his movement. Although the ticket gave Hernandez some expectations regarding the bus's movement—namely that it would transport him from Brownsville to Houston—VTC retained control over what route the bus would take, the speed the bus would travel, and when and where and for how long the bus would stop along the way. Specifically, the evidence shows that VTC retained the right to stop en route and pick up any passenger who flagged down a bus.[88]

Relying on the First Circuit's decision in *United States v. Woodrum*,[89] the Fifth Circuit also held:

Hernandez could neither exclude others nor direct that the bus driver take a particular route. He could not order that the bus continue moving toward its destination despite a driver-determined reason to stop. At the minimum, given that a VTC bus may make any number of stops to pick up passengers, it is reasonable to conclude that Hernandez assumed the risk that the bus would make unplanned stops, as well as the risk that during these stops the bus might be boarded by Border Patrol agents.[90]

Under these circumstances, the Fifth Circuit found the intrusion on Hernandez's Fourth Amendment rights to be "quite limited."[91] Ultimately, the court held that, "[a]ll in all,

---

[88] *Id.* at 488.

[89] 202 F.3d 1 (1st Cir. 2000). *Woodrum* involved the seizure of a taxi cab driver and a lone passenger. The *Woodrum* court held that the principle of third party consent with respect to the search of property over which persons have mutual use or control "can be adapted to seizures in some circumstances." *Id.* at 11.

[90] *Hernandez-Zuniga*, 215 F.3d at 488.

[91] *Id.*

the stop and immigration inspection is no more than a minor intrusion upon an individual passenger's liberty."[92]  Moreover, the court continued: "Compared to the limited intrusion on Fourth Amendment interests, the public concerns served by the stop are weighty."[93]

Ultimately, the Fifth Circuit held:

> In light of VTC's voluntary consent, and considering the public benefits of the stop as opposed to the intrusion upon the rights of the individual bus passenger, the balance tips in favor of finding the stop reasonable.  As a result, we hold that when a commercial bus company having a policy of making random, unplanned stops to pick up passengers consents to random stops and immigration inspections of its buses by the Border Patrol, a stop conducted in accordance with that consent does not violate the bus passengers' Fourth Amendment rights.  In this case, there is no evidence that the agreement between VTC and the Border Patrol was not voluntary, or that the scope of this stop and inspection went beyond the type of stop agreed to by VTC. As such, Hernandez's Fourth Amendment right to be free from unreasonable seizures was not violated when the Border Patrol stopped the bus.[94]

In the present case, the Defendant contends her case is clearly distinguishable from *Hernandez-Zuniga* for several reasons.  First, Defendant contends that, unlike in *Hernandez-Zuniga*, there is no consensual relationship between the DEA or its agents and the Tornado Bus Company to accommodate law enforcement's drug interdiction efforts.  Second, the Tornado Bus Company does not make random, unscheduled stops like the VTC buses.  Third, Officer Cowart did not stop the bus due to driver's consent; rather, he stopped the bus based on an alleged traffic violation.  Thus, Defendant contends there is no evidence that the passengers assumed the risk that the bus driver would consent to

---

[92] *Id.*, citing *Cf. Sitz*, 496 U.S. at 451, 110 S.Ct. 2481.

[93] *Id.*

[94] *Id.* at 489.

"suspicionless and warrantless seizures of the persons and belongings."[95]   For these reasons, Defendant contends the Government cannot rely on the consent of the bus driver and must establish that the passengers consented to the prolonged detention and the K-9 sniffing of their luggage.   Further, Defendant argues there is no evidence that the officers spoke to the passengers or attempted to ask for their consent to be detained while a narcotics K-9 sniffed the luggage compartments.   Additionally, none of the passengers were advised that they were free to leave.   Defendant contends that, under the totality of the circumstances, no reasonable passenger would have believed that they had a right to leave the scene or terminate the encounter.   As such, Defendant maintains that her Fourth Amendment rights were violated by the unlawful seizure of her person.

The Government acknowledges that no consensual relationship existed between the DEA and the Tornado Bus Company as in *Hernandez-Zuniga.*   However, the Government contends that such acquiescence was not required in this case because the bus driver's traffic violation justified the stop in question.   "In other words, the pre-existing relationship with the Border Patrol was imperative to justify the reasonableness of the initial seizure, namely, stopping the bus.   Our case is different, because Officer Cowart and his partner had reasonable suspicion that the bus driver committed violations of the motor vehicle traffic laws."[96]   Thus, the Government contends the Defendant's analysis of this long-running consensual relationship between law enforcement and the bus company is misplaced.

---

[95] Rec. Doc. No. 19-1, p. 5.

[96] Rec. Doc. No. 22, p. 9.

However, the Government does argue that the reasonableness principles analyzed in *Hernandez-Zuniga* are relevant and applicable to the facts of this case. The Government contends the Defendant relinquished a considerable amount of control over her movements by purchasing the bus ticket and allowing the bus to transport her to Georgia. Further, while the Government agrees that the Tornado Bus Company does not make unplanned stops like VTC, the Government contends the Defendant assumed the risk that during this trip, the bus could potentially be stopped by law enforcement for a routine traffic stop. Additionally, the Government notes that only three minutes passed from the moment Officer Cowart received consent to search from the bus driver to the time the K-9 alerted to the Defendant's luggage.[97] Thus, the Government argues that the bus driver's consent to extend the duration of the seizure was imputed to the Defendant, and the delay caused by this extension was reasonable.

The Court finds, while the Defendant has raised some significant distinguishing factors between her case and *Hernandez-Zuniga*, the Fifth Circuit case law supports the Government's position that the bus driver's consent to the seizure, which extended the traffic stop by three minutes, was imputed to the bus passengers and not unreasonable.[98] The Supreme Court has made it clear that "[t]he reasonableness of seizures that are less intrusive than a traditional arrest depends on a balance between the public interest and the

---

[97] The Government acknowledges Romero's testimony that the stop and search took 30 minutes; however, the Government contends this is just one of many inconsistencies and errors in his memory from that night.

[98] While Romero testified that be believed this stop to take approximately thirty (30) minutes, he also testified that "the stops when they stop us last from 15 to 45 minutes." Rec. Doc. No. 31, p. 77. Based on the questions previously raised by the Court regarding Romero's memory of this particular stop, and the officers' testimony regarding the stop, the Court is inclined to believe this stop lasted between 3 and 15 minutes.

individual's right to personal security free from arbitrary interference by law officers."[99] While seizures by consent generally are considered reasonable,[100] "the reasonableness of a seizure by third-party consent is less direct and must be analyzed by balancing the public interest against the individual's rights, as affected by another's consent to an intrusion."[101] The Court finds that the Defendant in this matter assumed the risk that the bus would make unplanned stops, as well as the risk that the bus might be pulled over by law enforcement for traffic violations.[102]

The Defendant invites the Court to adopt the reasoning of the United States District Court for the District of Oregon in *United States v.Pina-Lopez*,[103] an unpublished opinion wherein the court disagrees with the reasoning and analysis in *Woodrum* and *Hernandez-Zuniga*. However, Defendant ignores the fact that this Court is bound by Fifth Circuit precedent and must apply the reasoning and analysis set forth in *Hernandez-Zuniga* to the facts of this case.

Applying a preponderance of the evidence standard, the Court accepts the testimony of the officers that the traffic stop and search took closer to three minutes than thirty minutes for the same reasons set forth above regarding Romero's memory of the

---

[99] *Brown v. Texas*, 443 U.S. 47, 50, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979) (citations and internal quotation marks omitted).

[100] *See Florida v. Jimeno*, 500 U.S. 248, 250–51, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991).

[101] *Woodrum*, 202 F.3d at 11.

[102] The Court adopts the reasoning in *Woodrum* that, "to the extent that a passenger assumed the risk that the driver would consent to the intrusion ... the intrusion is not an impediment to reasonableness." *Id.* at 12, citing *United States v. Matlock*, 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974).

[103] No. 12-0267-AA, 2013 WL 867430 (D. Or. Mar. 8, 2013).

night in question. The Court also finds that, upon balancing the privacy interests of the Defendant, which the Court by no means takes lightly, with the public interest in deterring drug trafficking, the public interest outweighs the three minute inconvenience placed upon the passengers of the bus. Therefore, the Court finds that the principle of third-party consent applied to the seizure of the Defendant under the facts of this case.

### 3.    Third-Party Consent - Search

For the same reasons set forth previously, the Court also finds that the bus driver's consent applied to the search of the Defendant's luggage. As the Fifth Circuit stated in *Hernandez-Zuniga*:

> In the context of searches, it is well established that the police may conduct a warrantless search of an area without running afoul of the Fourth Amendment if a third party with common control over the area consents to the search. In *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), the Court held that the consent of a person with common authority over a shared bedroom legitimated a warrantless search of the room and that the consent of the other occupant was not necessary. The Court noted that "it is reasonable to recognize that any of the co-inhabitants [of the room] has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *Id.* 415 U.S. at 171 n. 7, 94 S.Ct. 988. We have found this reasoning to be equally applicable to consensual searches of automobiles. *See United States v. Crain*, 33 F.3d 480, 484 (5th Cir.1994); *United States v. Baldwin*, 644 F.2d 381, 383 (5th Cir. Unit A 1981) (per curiam) (holding that a person with common authority over an automobile may consent to the search, even if another person with common authority objects to the same).[104]

In this case, the Defendant, the bus driver, and Tornado Bus Company had common authority over the luggage compartment of the bus and its contents. Clearly, "[c]onsent by

---

[104] *Hernandez-Zuniga*, 215 F.3d at 487.

a person who possesses common authority over premises or effects is valid as against a non-consenting person with whom that authority is shared."[105] Thus, under the applicable law, Romero's consent to search the luggage compartment of the bus was also imputed to the Defendant. Accordingly, for the reasons set forth above, the motion to suppress the evidence is DENIED.

### D. Alleged *Miranda* Violation

The Defendant has also moved to suppress both the alleged statements made at the scene of the traffic stop and the alleged statement later made to Agent Lipani.

#### 1. Alleged Statements

Officer Cowart testified that he witnessed Officer Bickham give the Defendant her *Miranda* warnings as soon as she stepped off the bus. Specifically, Officer Cowart testified:

> And we asked Ms. Miranda[106] if she understood and she said yes in English. She said yes. And at that time the bag was on the ground still. ... I asked Ms. Miranda, "Is this your bag?" And she said, "Yes, that's mine." And at that time I placed her in handcuffs...[107]

Officer Bickham testified that, "as soon as she got off the bus I asked her if she could understand me and that's when we Mirandized her."[108] Officer Bickham also testified

---

[105] *United States v. Koehler*, 790 F.2d 1256, 1259 (5th Cir. 1986)(citing *Matlock*, 415 U.S. at 171).

[106] The name on the claims tag read Vanessa Miranda but was identified as belonging to the Defendant, Vanessa Hernandez. Any reference to Ms. Miranda refers to the Defendant in this matter.

[107] Rec. Doc. No. 31, p. 16.

[108] *Id.* at p. 43.

that, before he Mirandized her, he asked "if she could understand me and speak English,"[109] because he acknowledged that, "if she didn't that [sic] would have to get an interpreter which we have access to on the interstate that we have used before."[110] When Officer Bickham asked the Defendant if she wanted to cooperate, Bickham testified that she responded in English, "yes."[111] Officer Bickham also testified as follows:

> Once she was saying she wanted to cooperate, she spoke well English, but it had a little accent to it, but I could clearly understand what she was saying and she clearly understood what I was saying because she would answer every question I asked her in English.
>
> * * *
>
> I asked her if she wanted to cooperate and she said yes, she does. And then I asked her, for our safety as well as hers, is there anybody else on the bus that is aware of what's in that bag, and she says no, that she is the only person on the bus that has knowledge of that bag. And then I asked her where did she get the bag from. She told me she got it from a male in Houston, but she didn't tell me where or the male's name. And then I asked her what she was going to do with the bag. She said she was told to bring it to Atlanta and when she got to Atlanta just to wait and somebody would be contacting her by phone and to meet her.[112]

Officer Bickham also testified that the above answers of the Defendant were given in English. Bickham testified that, when he asked the Defendant if she wished to cooperate with law enforcement in a controlled delivery, "she said she did want to cooperate and she wanted to participate. But as soon as the bus pulled off she immediately started acting like

---

[109] *Id.*

[110] *Id.*

[111] *Id.* at p. 46.

[112] *Id.* at p. 47.

she didn't speak English."[113]

Agent Lipani testified that the Defendant was again Mirandized at the DEA Baton Rouge Residence Office, this time in Spanish, and that the Defendant indicated that she fully understood her rights, that she did not wish to speak, and she requested a lawyer.[114] Despite this assertion of her rights, Agent Lipani testified that, as soon as the other agents left the room and only she and the Defendant remained, the Defendant "began to break down and asked, begged me not to send her to jail, to please let her go. She also said that she had just done it because she needed money for her kids."[115] Agent Lipani was asked if she had made any promises or statements to the Defendant to prompt or elicit any communication with the Defendant. Agent Lipani unequivocally responded "no" to each of these questions.[116]

2.    Arguments

The Defendant moves to suppress any statements allegedly made by her to the officers at the scene or to Agent Lipani. The Defendant contends that any statements made to the officers took place during a custodial interrogation, "surrounded by officers with guns, and on the shoulder of the interstate."[117] Defendant additionally contends that she

---

[113] *Id.* at p. 48.

[114] *Id.* at p. 63.

[115] *Id.* at p. 66.

[116] *Id.*

[117] Rec. Doc. No. 33, p. 20.

does not fluently speak and understand the English language and, thus, did not fully understand her *Miranda* rights. Defendant further contends that, following the K-9 alert of her luggage, she was removed from the bus, handcuffed and placed in back of the police unit. At this point, she did not feel free to voluntarily leave. She claims she was read her *Miranda* rights in English after she had already been placed in the police car.

The Defendant also complains that Officer Bickham testified that he read the Defendant her rights and stated, in part: "And if she can't afford to hire [an attorney], the courts would represent her free of charge..."[118] Defendant contends that this assertion "is materially misleading and does not indicate that she is entitled to an appointed *attorney*."[119]

The Defendant also challenges any alleged statement made to Agent Lipani, claiming that this spontaneous statement was not mentioned in any of the police reports prepared by the investigators. The Defendant also notes that there was no recording of the alleged statement and no witnesses to the same. Additionally, Defendant contends that the Government failed to "scrupulously honor" her invocation of her *Miranda* rights by having Agent Lipani remain in the room after the others had left. The Defendant argues that "[t]his was clearly done for the purpose of eliciting additional statements from the defendant and should thus be held inadmissible."[120]

The Government contends that the testimony of both Officers Bickham and Cowart

---

[118] Rec. Doc. No. 31, p. 45.

[119] Rec. Doc. No. 33, p. 21, n. 7, citing *United States v. Perez*, 348 F.3d 839 (9th Cir. 2003)(emphasis in original).

[120] *Id.* at p. 22.

indicates that the Defendant was given her *Miranda* rights at the door of the bus, as soon as she stepped off the bus. Both officers also testified that, in their view, the Defendant understood English and communicated sufficiently with them in English to reasonably believe the Defendant understood that she was waiving her rights by answering the officers' questions. Indeed, Officer Bickham testified that the Defendant communicated in English regarding her role and participation in the trafficking of methamphetamine and her potential participation in a controlled buy. Thus, the Government contends that the evidence supports a finding that the Defendant made a voluntary, knowing, and intelligent waiver of her *Miranda* rights at the scene of the traffic stop.

The Government also argues the spontaneous statement made to Agent Lipani is admissible because the record establishes that, although the Defendant was in custody at this point, she was advised of her rights in Spanish, and Agent Lipani did nothing to provoke the Defendant's statement.

### 3.    Law and Application

"A confession is voluntary if, under the totality of the circumstances, the statement is the product of the accused's free and rational choice."[121] Where a defendant challenges the voluntariness of the confession, the burden is on the government to prove, by a preponderance of the evidence, that the statement made was voluntarily.[122]

The test for determining the voluntariness of statements is whether, under the totality

---

[121] *United States v. Garcia Abrego*, 141 F.3d 142, 170 (5th Cir.1998) (citation omitted).

[122] *Id.*

of the circumstances, the accused "made an independent and informed choice of his own free will ... his will not having been overborne by the pressures and circumstances swirling around him."[123]  To this end, police officers must inform a person who they have arrested of her Miranda rights.  "Cases in which a defendant can make a colorable argument that a self-incriminating statement was compelled despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."[124]  Moreover, a suspect's Fourth Amendment rights are not violated simply because he fails to explicitly waive his *Miranda* rights.[125]  By choosing to answer officers' questions after being read her  *Miranda* rights, a suspect demonstrates her intent to forfeit those rights, even if she does not explicitly waive them.[126]

Where there is a potential language barrier, the Fifth Circuit has held:

> [I]n regard to Spanish speaking defendants, where there is sufficient conversation between the suspect and law enforcement officers to demonstrate that the suspect had an adequate understanding of English to fully comprehend the situation, a finding that consent was voluntary may be proper.  *United States v. Alvarado*, 898 F.2d 987, 991 (5th Cir.1990).[127]

Furthermore, "[e]ven if English is not [a defendant's] primary language, as long as the defendant can effectively communicate with the law enforcement officer at the time

---

[123] *United States v. Rouco*, 765 F.2d 983, 993 (5th Cir.1985).

[124]  *Dickerson v. United States*, 530 U.S. 428, 444, 120 S.Ct. 2326, 2336, 147 L.Ed.2d 405 (2000) (quoting *Berkemer v. McCarty*, 468 U.S. 1, 104 S.Ct. 2901, 82 L.Ed.2d 1. 420, 433, a 20, 468 U.S. 420, 104 S.Ct. 3138, 3138, 82 L.Ed.2d 317 (1984)).

[125] *United States v. Hearn*, 563 F.3d 95, 104 (5th Cir. 2009).

[126] *Id.*

[127] *United States v. Monarrez-Mendoza*, No. 12-cr-0054(02), 2013 WL 961447, at * 4 (N.D. Tex. Mar. 6, 2013).

consent is given, the consent to search can be found voluntary."[128]  Of course, the same logic can be applied to a statement given after a *Miranda* warning.

As discussed previously, the Court is tasked with credibility determinations on a motion to suppress.  Also, the standard the Court must apply is a preponderance of the evidence.  Officers Cowart and Bickham corroborated each other's testimony that the Defendant was given her *Miranda* warnings as she stepped off the bus and not after being placed in the police car, as alleged by the Defendant.  Officer Bickham testified under oath that the Defendant communicated with them in English about the circumstances involving the drugs discovered in Defendant's bag.  No evidence was produced at the hearing which undermined or refuted this testimony, and no evidence was presented by the Defendant to overcome the preponderance of the evidence that the officers testified truthfully.  Moreover, the fact that the officers were aware of the procedure for obtaining an interpreter to come to the scene, and had utilized such procedure in the past, also suggests that they would have employed such a procedure had they reasonably believed it was necessary.  Officer Bickham testified that, had the Defendant responded that she did not understand English, "I would have to get an interpreter which we have access to on the interstate that we have used before."[129]

The uncontradicted evidence in the record indicates that the Defendant was advised of her rights in a language that she sufficiently understands.  As such, the fact that the

---

[128] *Id.* at *5, citing *United States v. Khanalizadeh*, 493 F.3d 479,484 (5th Cir. 2007), *United States v. Ngai Man Lee*, 317 F.3d 26, 33–34 (1st Cir. 2003).

[129] Rec. Doc. No. 31, p. 44.

Defendant was not informed of her rights in Spanish, even if that is the language she prefers or is more comfortable with, does not negate the validity of what were otherwise knowing, intelligent and voluntary waivers of the Defendant's *Miranda* rights.[130]

As to the allegation that Officer Bickham misstated the Defendant's *Miranda* rights rendering them "materially misleading," argued by Defendant in a footnote, the Court finds this argument without merit. The Supreme Court has repeatedly declined to dictate the particular words in which the *Miranda* information must be conveyed.[131] However, the words the officer employs must reasonably convey to a suspect her rights as required by *Miranda*.[132] Defendant contends that Officer Bickham's misstatement that "the courts would represent her free of charge" misled the Defendant and prevented a complete understanding of her rights. First, there is no evidence that this misstatement was material

---

[130] *See, e.g., United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir.1995) (finding that defendant gave knowing and voluntary waiver of his rights where he had "a reasonably good command of the English language"); *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir.1989) (holding that a defendant with "limited" English proficiency nonetheless made a valid Miranda waiver); *United States v. Rom*, No. 2:10–CR–146, 2011 WL 5239224, at *5, 2011 U.S. Dist. LEXIS 126524, at *12 (D.Vt. Nov. 1, 2011) ("[A]ny limited language barrier possessed by Defendant does not appear to have prevented Defendant from making the waiver with full awareness of both the nature of the right being abandoned and the consequence of the decision to abandon it." (citation and internal quotation marks omitted)).

[131] *See Florida v. Powell*, 559 U.S. 50, 60, 130 S.Ct. 1195, 1204, 175 L.Ed.2d 1009 (2010) (noting that, although the four warnings *Miranda* requires are invariable, the Court has never dictated the words in which the essential information must be conveyed); *Duckworth v. Eagan*, 492 U.S. 195, 202, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1989) (commenting that the Court has never required that Miranda warnings be given in the exact form described in that decision); *California v. Prysock*, 453 U.S. 355, 359–60, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981) (remarking that Miranda itself indicated that no talismanic incantation was required to satisfy its strictures).

[132] *Powell*, 130 S.Ct. at 1204–05 (the relevant inquiry is whether the warnings reasonably conveyed to a suspect his *799 rights as required by *Miranda*; the words used must be sufficiently comprehensive and comprehensible when given a commonsense reading); *Duckworth*, 492 U.S. at 202, 109 S.Ct. 2875 (a fully effective equivalent of the warnings listed in *Miranda* is sufficient); *Prysock*, 453 U.S. at 359–60, 101 S.Ct. 2806 (the *Miranda* warnings or their equivalent will suffice).

---

to the Defendant's understanding of her rights such that it invalidated her waiver. Second,

the Court finds that, when read in the context of Officer Bickham's statement, there was no

confusion that the Defendant was advised that she was entitled to an attorney at all times.

Officer Bickham testified specificallly:

> When I read her rights I advised her that she had the right to remain silent; anything she say could be used against her in a court of law; she had the right to talk to an attorney, have him present with her while being questioned. And if she can't afford to hire one, the courts would represent her free of charge and she can decide at any time by exercising her rights by not answering any questions.[133]

The Court simply cannot find from the record in this case that Officer Bickham's

*Miranda* warnings were materially misleading or so inadequate that they confused the

Defendant or invalidated her waiver.

Likewise, there is no evidence to support suppression of the statements allegedly

made to Agent Lipani. At this point, the Defendant had been *Mirandized* a second time in

Spanish. No evidence has been presented to suggest that Agent Lipani was coercive or

hostile in her questioning of the Defendant. Moreover, there is no evidence to suggest that

the Defendant's invocation of her right to remain silent and right to counsel was not

honored. Agent Lipani testified that she did not further question, speak to, or elicit any

communications from the Defendant after the invocation of her rights.

In *Bram v. United States*,[134] the United States Supreme Court held that the

---

[133] Rec. Doc. No. 31, pp. 44-45. The Court also recognizes that Bickham was testifying from memory and may not have misstated the Defendant's *Miranda* rights at the time they were given.

[134] 168 U.S. 532, 542-43 (1897).

voluntariness of a confession depends upon whether the confession was "extracted by any sort of threats of violence, obtained by any direct or implied promises however slight, [or] by the exertion of any improper influence." In *Schneckloth v. Bustamonte*,[135] the Court explained the voluntariness test:

> Is the confession the product of an essentially free and unconstrained choice by its maker? If it is, if he has willed to confess, it may be used against him. If it is not, his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.[136]

Whether or not a confession is made freely and voluntarily must be determined in light of the totality of the circumstances.[137]

Based on the evidence outlined above, the Court finds that the Defendant was fully advised of her rights by Agent Lipani, in a language that she admittedly understood, and that she voluntarily and intentionally waived those rights when she continued to speak to Agent Lipani. There is absolutely no evidence that Agent Lipani continued to question the Defendant or that her mere presence in the room was somehow coercive or threatening such that the Defendant's statement was involuntary. There is no dispute that, once an accused in custody has expressed her desire to have counsel, she is not subject to further interrogation by authorities until counsel has been made available.[138] However, an accused

---

[135]  412 U.S. 218 (1973).

[136]  *Id.* at 225.

[137]  *See United States v. Foy,* 28 F.3d 464, 474 (5th Cir. 1994); *United States v. Laury*, 985 F.2d 1293, 1314 (5th Cir.1993).

[138]  *See United States v. Hawkins*, 554 F.Supp.2d 675, 682 (N.D. Tex. 2008).

can "knowingly and intelligently waive the right [she] had invoked."[139]   The exchange described above satisfies the Supreme Court's requirement that "the defendant must have initiated further discussions with the police."[140]   Therefore, the motion to suppress the statements is also DENIED.

## III.    CONCLUSION

For the reasons set forth above, the *Motion to Suppress*[141] the evidence and statements is DENIED.  This matter is set for a jury trial on Wednesday, April 1, 2015, at 9:00 a.m. in Courtroom 3.

**IT IS SO ORDERED**.

Signed in Baton Rouge, Louisiana, on <u>February 27, 2015</u>.

**JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[139] *Smith v. Illinois*, 469 U.S. 91, 94-95,105 S.Ct. 490, 83 L.Ed.2d 488 (1984).

[140] *Id.*

[141] Rec. Doc. Nos. 16 & 19.